IN RE LUIS M. PAGÁN, Respondent.

No. 75. Argued July 6, 1950.—Decided July 26, 1950.

*Angel Roberto Díaz* for respondent. *J. Rivera Barreras, Fiscal of the Supreme Court,* and *Frank J. Vizcarrondo, Assistant Fiscal,* for the People.

PER CURIAM: On December 5, 1949 the *Fiscal* of this Court, in behalf of the Attorney General, filed a petition of disbarment against Attorney Luis M. Pagán. In his answer, respondent stated, in addition to other defenses,[1] the following: 1. That the Attorney General is not authorized either personally or through the *Fiscal* of this Court, to file a petition of disbarment. 2. That in the present case the procedure established by the Act of March 11, 1909, creating the Committee on Character, has not been followed but on the contrary that the procedure followed was not authorized by law.

After the answer was filed, this Court appointed Attorney Gabriel de la Haba as Master on March 31, 1950 to hear and receive the evidence of both sides and to render his report containing his conclusions of fact, which he did on May 17, 1950. Subsequently, respondent and the *Fiscal* filed their objections to the same.

Before examining the Master's report it seems pertinent to discuss the defenses alleged by the respondent.

Indeed, the Act of March 11, 1909, creating the Committee on Character, does not confer on the Attorney General of Puerto Rico the power to file petitions of disbarment, but if respondent had examined Act No. 43 of May 14, 1932 (Sess. Laws, p. 522) organizing the Bar Association of Puerto Rico, he would have noticed that under § 2(g) it expressly provides:

---

[1] The other defenses are so manifestly irrelevant that we will neither state nor discuss them.

". . . . . . . Nothing provided in this paragraph shall be understood to restrict or alter the power of the Attorney General of Porto Rico to institute such proceedings on his own initiative."

But the fact is that apart from any provision which would be merely directive for this Court, the removal, as well as the admission to the practice of law, is an inherent power to the judicial branch and this Court may, pursuant to such power, follow the procedure which it might deem proper, so long as it is in harmony with the due process of law and the procedure followed in this case is clearly so.

■ Having disposed of the legal questions we shall turn to the Master's report. It literally says:

### "REPORT AND FINDINGS OF FACT

"The *Fiscal* of this Honorable Court filed a petition against Attorney and Notary Luis M. Pagán requesting that he be suspended from the practice of attorney-at-law and notary.

"By an order of this Honorable Court of March 31, 1950, the writer of this report was appointed as Master to hear and receive all the evidence and to certify and send it to the Court with his findings of fact.

"By an order of April 3, 1950, this Honorable Court set April 24, 1950 at 9 in the morning for the hearing of the charges and presentation of evidence.

"On the day and hour fixed, the Honorable *Fiscal* of the Supreme Court appeared before the Master to sustain the charges and respondent, Attorney Luis M. Pagán, appeared in person and represented by counsel.

"Public hearings were held on April 24, 25 and 26, 1950, in continuous sessions, in the morning and afternoon until both parties concluded introducing the evidence and submitted the case for the Master's report.

"Mr. Durán, stenographer of the Department of Justice, acted as court reporter with the consent of both parties. The witnesses for the prosecution and for the defense testified under oath, having been sworn in by the Secretary of this Honorable Court.

"The hearings were held during the afore-mentioned three days with the attendance of the Secretary and the Marshal of this Court.

"Eleven witnesses testified for the *Fiscal* and eleven other witnesses and respondent himself, Attorney Luis M. Pagán, testified for the defense and one witness for the prosecution in rebuttal.

"The documentary evidence consists of 55 exhibits for the prosecution and 8 exhibits for the defense. From this documentary evidence 43 exhibits of the prosecution were admitted without objection and 12 with respondent's objection which appear in the stenographic record of the hearing. The 8 exhibits offered by respondent were admitted without objection from prosecution.

"As a result of the testimony offered by witnesses for both parties and of an examination of the documentary evidence admitted and which the Master has considered relevant and material to the controversy, as well as from his personal observations of the witnesses and the way and manner in which they testified to the questionaires of both parties the Master finds that the following facts were proved:

### "FINDINGS OF FACT

"1. Respondent was admitted to the bar by the Supreme Court of Puerto Rico on April 20, 1944 and as notary on May 3, 1944.

"2. The Home Expansion Company, a corporation engaged in building homes, employed the services of respondent as attorney and notary.

"3. By letter of June 26, 1948 addressed to the Home Expansion Company by Enrique Pagán Viera, (*Fiscal's* Exhibit 3) the latter authorized the company to sell 10 lots which he owned in the Truman Development in Río Piedras, at $8.00 per square meter and agreed to pay to the Company a 5 per cent commission. This was the commencement of the business relations between Home Expansion Co. and Enrique Pagán Viera. Apparently, the complaint in this case covers only the transactions related with seven of the ten lots as may be seen from Exhibits 6 to 12, both inclusive, admitted as evidence for the prosecution.

"4. It appears from the oral evidence that Enrique Pagán Viera agreed to convey the title of ownership to all the purchasers of the lots without having received the purchase price and to state in deed of conveyance that the price had been received, under an agreement with the Home Expansion Co. This agreement was to the effect that he would receive in cash a sub-

stantial amount of the purchase price as soon as the buyers obtained a mortgage loan on the lots and the construction to be erected thereon by the Home Expansion Co. These loans were to be obtained from any local bank through the federal agency known as the Federal Housing Administration which secures such loans to the banks making them. The remainder was to be received by Mr. Pagán Viera within one year either from funds which were to be raised on a second mortgage by the purchasers of the lots who were veterans, by transactions with the Veterans Administration which were to be conducted by the Home Expansion Co. for the purchaser of the lots.

"5. The transaction with the Veterans Administration was not successful. As a consequence the funds with which the Home Expansion Co. had proposed to liquidate the remaining debt with vendor Pagán Viera were not raised.

"6. It also appears from the documentary and oral evidence that Attorney Luis M. Pagán, respondent in this case, prepared then deeds of second mortgages in favor of Enrique Pagán Viera and obtained the signatures of the purchasers of the lots, but not the signature of Pagán Viera who refused to sign them. See Exhibits 23 to 33 both inclusive. It also appears from the evidence that Pagán Viera refused to sign such deeds because to do so was not in accordance with his agreement with the Home Expansion Company, since the proposed mortgages were to be paid in long terms and in monthly payments and this, he alleged, was not in accord with the original agreement which provided for the maximum term of one year. The evidence does not show whether this failure to comply with the agreed conditions was due to some act of the respondent or if it was exclusively the responsibility of the Home Expansion Co. and of its president, Mr. Ward.

"7. The deeds of sale of Enrique Pagán Viera to the different purchasers, Exhibits 6 to 12 both inclusive, were executed at the end of November and the beginning of December, 1948. On November 20, 1948, the Home Expansion Co. had apparently paid Mr. Pagán Viera the cash amount agreed, since on that date, according to Exhibit 5, it delivered him a promissory note for $8,700 which was the remainder still owed him, which promissory note, among other things, referring to the payment says: 'it will be paid by us by mortgages which will be constituted opportunely'. These mortgages which were drawn up by Attorney Luis M. Pagán, are the ones which according to the

evidence, Mr. Pagán refused to sign because they did not meet the conditions of his agreement to the effect that the term would be one year.

"8. In April, 1949 there had not yet been executed satisfactory mortgages in favor of Pagán Viera although he demanded compli- ce with the contract he had with the Home Expansion Co. this contract was recognized in the document of November 20, 1948, Exhibit 5, and there was still owed to him the sum of $1,869 from the amount payable in cash which he should have received at the time he executed the deeds of sale to the purchasers of the lots in which he acknowledged the receipt of the entire amount.

"9. When Mr. Pagán Viera insisted that there be compliance with the agreement, the Home Expansion Co. proposed to Mr. Pagán Viera through respondent that it would pay him the sum of $1,869 and the remainder in 4 equal monthly payments to become due on the months from June to September, 1949. After the debt of $8,700 had been readjusted to $8,390 and the sum of 500 reduced with the consent of Mr. Pagán Viera, there remained a balance, owed to him by the Home Expansion Company of $7,890 which represented the 4 monthly instalments agreed on. In fact, respondent Luis M. Pagán acting then as attorney, drew up the contract between Enrique Pagán Viera and the Home Expansion Co. on April 29, 1949, by affidavit No. 1124 which respondent authenticated in his capacity as notary. In this contract, paragraph 3 states that 'second mortgages have been constituted' for the total sum of $8,390. Under paragraph 7 the Home Expansion Co. bound itself to pay the amount owed reduced to $7,890 in four equal instalments of $1,972.50 each one; and under paragraph 8 both parties agreed that 'in order to faithfully comply with this obligation, the Home Expansion Co. binds its present and future property and specially the second mortgages which appear constituted in the sales of some of the lots as follows:'

"10. The truth is that when the contract to which the preceding paragraph refers was executed no second mortgages had been constituted on any of the lots sold by Mr. Pagán Viera.

"11. After the contract between Pagán Viera and the Home Expansion Company of April 29, 1949 (Exhibit 13), was consummated respondent Luis M. Pagán rewrote the last 3 or 4 pages of each one of the deed of second mortgage that Mr. Pagán Viera had refused to sign, in order that the purchasers of the

lots should commence to sign the new pages by virtue of which the second mortgages were executed in favor of the Home Expansion Co. instead of in favor of Pagán Viera. The deeds prepared for Mr. Pagán Viera's signature remained as mere unsigned projects and the notary was left free to adapt them for the other transactions of second mortgages with the Home Expansion Company. See Exhibits 23 to 30 both inclusive. As to Exhibits 31, 32 and 33 it was admitted by respondent that the last pages had also been changed in order to redraft the second mortgages directly in favor of the Home Expansion Company.

"12. Enrique Pagán Viera gave his consent, to be paid directly by the Home Expansion Company in 4 monthly instalments the total amount which they owed him on April 29, 1949 amounting to $7,890 but in that contract (Exhibit 13) the Home Expansion Company specially assumed the second mortgages which although according to the contract 'they appear to be constituted on the sales of some of the lots' the truth is that they had not yet been constituted, it being inferred therefrom that it was the intention of the parties to secure by the 7 second mortgages which were to be constituted and which were finally constituted by the debtors directly in favor of the Home Expansion Company, the debt of the Home Expansion Company in favor of Pagán Viera for the sum of $7,890.

"13. Respondent finally obtained the signatures of the debtors of the second mortgages directly in favor of the Home Expansion Company during the months of May and June, 1949 (Exhibit 14 to 20).

"14. Since the Home Expansion Co. bound itself to specially assume the second mortgages which had not yet been executed by the purchasers of the lots and of which they still owed Enrique Pagán Viera the sum of $7,890, respondent acted negligently because he left Enrique Pagán Viera without any security when he could have executed the second mortgages in favor of mortgage notes payable to the Home Expansion Co. which in turn could have endorsed them and given them as a collateral security to Mr. Pagán Viera, or said respondent could have also mortgaged the mortgage right of the Home Expansion Co. in order to secure the debt to Mr. Pagán Viera. In his capacity as attorney who prepared and drew up the contract of April 29, 1949 (Exhibit 13) and in his capacity as notary who authenticated such contract and later drafted and executed the deeds of the second mortgages (Exhibits 14 to 20) respondent showed igno-

rance of the law, neglect in the fulfilment of his duties toward the contracting parties and caused to Mr. Pagán Viera the loss or possible loss of $7,890 as the result of the subsequent bankruptcy of the Home Expansion Co.

"15. As a conclusion of secondary importance which appears from the oral and documentary evidence, the Master was able to appreciate and decide that when the deeds of the second mortgages were signed neither the representative of the Home Expansion Company and his wife nor the subscribing witnesses who appear in said deeds were present and that the parties did not know said witnesses. It is likewise concluded from the evidence that it was the practice of Notary Luis M. Pagán to obtain the signatures of the parties to the deeds and then obtain the signatures of witnesses who had not been present in the act and at times did not know the parties.

"16. It is concluded from an analysis of the oral and documentary evidence that after the first instalment of $1,972.50 according to the contract of April 29, 1949 (Exhibit 13) became due on June 2, 1949, creditor Pagán Viera personally took steps but without success for the collection of said sum and that tired of visiting Attorney Luis M. Pagán he gave the matter to Attorney Octavio Jiménez. Attorney Jiménez to whom creditor Pagán Viera spoke several days after June 2, 1949, arranged an interview in the offices of the Home Expansion Company in which respondent, Mr. Ward of the Home Expansion Co., Pagán Viera, and the Attorney Mr. Jiménez were present. The date of this interview does not appear from the evidence and it only appears that it was held on a Friday, which must have been in the month of June which was the month when the first instalment which the Home Expansion Co. was bound to pay Mr. Pagán Viera was due. It was in this interview that Attorney Jiménez found out for the first time that the Home Expansion Co. had bound itself to deliver certain mortgages to Mr. Pagán Viera since when the latter went to his office he only asked him to procure the collection of the first instalment and of all the remaining amounts which the Home Expansion Co. owed him. At the time Attorney Jiménez learned that those were the mortgages referred to in the contract of April 29, (Exhibit 13) being then informed by respondent Pagán that those mortgages had been assigned by Pagán Viera to the Home Expansion Co., Attorney Jiménez asked that said mortgages be returned to his client and that this assignment be made immediately in view of

the financial situation of the Home Expansion Co. It was agreed to assign said mortgages to Mr. Pagán Viera and Attorney Jiménez was asked to prepare the document, whereupon respondent Luis M. Pagán handed him the deeds of second mortgage. Attorney Jiménez immediately prepared the deed of assignment of mortgages (Exhibit 22) and a model of consent of authorization from the Home Expansion Co. to Mr. Ward to make such assignments (Exhibit 21) and all of them were summoned to sign the deeds on Tuesday at 2 P. M. on which day Attorney Jiménez went to the Home Expansion Co. and found 'that the Home Expansion Co. had had a financial collapse' and for such reason the document of assignment of the second mortgage credits was not signed. The evidence does not reveal either to which Tuesday does witness Attorney Jiménez refer but it also appears from all the evidence that he refers to a Tuesday in the month of June, 1949. The only evidence related with the so-called financial collapse which brought about the departure of Mr. Ward, President of the Home Expansion Co., is in the re-direct examination of witness Adolfo Vilanova Jr. who testified that Mr. Ward left either on June 19 or 20, 1949.

"17. About the same time that Enrique Pagán Viera took steps to collect the debt from the Home Expansion Co. and when they had reached an agreement on the conveyance of the second mortgages, the Home Expansion Company owed the Borinquen Hardware Store owned by Adolfo Vilanova, a certain amount and Mr. Ward, President of that corporation, had requested to have his credit increased up to the sum of $10,000. Mr. Ward offered the second mortgages as collaterals and respondent Luis M. Pagán was asked to prepare the documents of assignment of credits which he later took to Mr. Vilanova and the latter had them revised by his Attorney Mr. Hita. It was finally agreed that the deeds of assignment of credits would be signed on Friday, June 10 and on that date respondent Pagán took eight deeds which amounted to more than $9,000 to Mr. Vilanova to sign. The deeds were signed on that day by Mr. Ward and his wife and by Mr. Vilanova.

"18. The deeds signed by Mr. Vilanova and the Home Expansion Company through Mr. Ward are Nos. 72 to 78 both inclusive, of June 14, 1949, Exhibit 37 to 43 both inclusive. These deeds although they appear to be signed by the parties, by the witnesses, all its pages stamped with the Notary Seal and the corresponding internal revenue stamps affixed and cancelled,

they do not appear signed, marked or rubricated by Notary Luis M. Pagán. After the deeds were signed, respondent told Mr. Vilanova that he could deliver materials to the Home Expansion Co. up to the remainder of the credit of $9,720 with the assignment of the second mortgages as collaterals and the Borinquen Hardware Store delivered materials to the Home Expansion Co. for the amount of $4,207.58 on Monday June 13, 1949. Respondent Mr. Pagán equally informed Vilanova that he would prepare a contract for his signature in which Vilanova promised to return to Mr. Ward the mortgages once the credit was paid but such contract was never taken to Mr. Vilanova for his signature.

"19. Even though the deeds were signed and ratified on June 10, 1949 and they should have been incorporated to Notary Luis. M. Pagán's protocol on that same day, they appear as executed on Tuesday, June 14, and not signed, marked or rubricated by the notary.

"20. On the date in which the deeds were signed as well as the date which was stated therein as the date of execution, respondent Luis M. Pagán knew or should have known that the second mortgages were bound or affected by the credit of Enrique Pagán Viera and when respondent authorized its assignment to Adolfo Vilanova and told him that he could deliver the remainder of the material up to the total amount of the credit to the Home Expansion Co., fraud was being committed against this merchant and due to the subsequent bankruptcy of the Home Expansion Company he has been caused a loss not only of the credit which he had already given to the Home Expansion Co. amounting to $3,552.65 but also of $4,207.58 which the Borinquen Hardware Store delivered in materials to the Home Expansion Company on Monday, June 13, 1949. Although respondent tried to excuse his negligence and dereliction of duty alleging that he did not obtain the signature of the witnesses when the deeds were executed because he suspected or was not sure that they could be executed and that he confirmed this on the next day, Saturday, June 11, when he realized that the mortgages were bound to Enrique Pagán Viera, the truth is that respondent himself testified that he left them on his desk and that they were there until Tuesday, June 14 when his secretary gave them number, date of execution, attached the internal revenue stamps and the respondent's notarial seal. Although the deeds were signed on Friday, June 10, 1949 respondent did not inform them

in his notarial index of Monday, June 13, and it was not until July 5, 1949 that said notary delivered to the District Court of San Juan his notarial index corresponding to the week ending on June 19, 1949 (Exhibit 51 of the *Fiscal*) and, according to the evidence, because he was required to do so by the Judge Administrator of the District Court of San Juan. When respondent filed his index, comprising deeds Nos. 72 to 78 both inclusive, which correspond to Exhibits 37 to 43, both inclusive, he stated in a note in the report of each deed which says: 'not signed marked or rubricated by notary'. The actions of respondent Luis M. Pagán in connection with the credit for materials in favor of the Home Expansion Company and the collateral of this credit by the assignment of second mortgages to the owner of the Borinquen Hardware Store, Mr. Adolfo Vilanova, reveal a gross negligence on the part of the notary and a serious disregard for the protection of the interests of the parties which trusted him, as a consequence of which Mr. Vilanova has suffered a loss of more than $9,000.

"Such are the findings of facts reached by the Master after a careful and elaborate examination of all the oral and documentary evidence and conscious of the delicate mission entrusted to him by this Honorable Court."

Respondent and *Fiscal* presented their objections to the report. Those of respondent are directed to impeach the conclusions because in his opinion they are not supported by the evidence. Nevertheless, we have studied them in view of the evidence presented and there is no doubt that each and every one of those impeached by respondent are amply supported by the evidence.

With regard to the objections of the *Fiscal* we shall not stop to consider them because assuming that they were well grounded they would not alter the result in this case.

In our opinion, the report reveals a careful study of the evidence brought and it has the approval of this Court. It appears from the report, among other things, that respondent knew that the credits secured by second mortgages in favor of the Home Expansion Co., according to a contract with the latter, would be assigned by its owner in favor of Enrique Pagán Viera in order to secure the amount to be paid by the

instalment which was owed to him. Notwithstanding this, respondent was willing to authorize as notary the assignment of those credits in favor of Adolfo Vilanova, knowing that by doing so, the Home Expansion Co. was defrauding Pagán Viera, for at that time the Company was not sufficiently solvent to pay or guarantee the credits to Pagán Viera. At the same time, Vilanova was defrauded, for he was a creditor of the Home Expansion Co. in the sum of $3,552.65 and when the debtor offered said mortgages amounting to $8,390 he issued a credit up to $9,720 which was to be secured by said second mortgages. But respondent notwithstanding the fact that he had drawn the deeds and obtained the necessary signatures to make the assignment, did not authorize them with his signature and far from informing Vilanova he told him that he [Vilanova] could extend the credit of the Home Expansion Co. up to the sum of $9,720. Relying on respondent's representation and believing that the deeds had been authorized by the notary, Vilanova delivered to the Home Expansion Co. material for the sum of $4,207.88. Shortly afterwards the Home Expansion Co. went into bankruptcy. Pagán Viera as well as Vilanova were defrauded by the unscrupulous actions of respondent.

Even though all the actions of respondent were in his capacity as notary, the same involve such moral turpitude that they make him unworthy of practicing law.

Judgment will be rendered disbarring the respondent.